UNITED STATES COURT OF APPEALS  FILED
FOR THE SIXTH CIRCUIT
OCT 17 2006

No. 05-6477            FILED    LEONARD GREEN, Clerk
                     U.S. DISTRICT COURT
                     MIDDLE DISTRICT OF TENN.

JOHN McCARTHY et al.,
    Plaintiffs - Appellants,

OCT 19 2006

v.

DEPUTY CLERK

MIDDLE TENNESSEE ELECTRIC MEMBERSHIP CORPORATION et al.,
    Defendants - Appellees.

Before: MOORE, CLAY, and GRIFFIN, Circuit Judges.

## JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

                  **ENTERED BY ORDER OF THE COURT**

                  */s/ Leonard Green*
                  Leonard Green, Clerk

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0378p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

**FOR YOUR INFORMATION**

JOHN MCCARTHY et al.,
  *Plaintiffs-Appellants,*

v.

MIDDLE TENNESSEE ELECTRIC MEMBERSHIP
CORPORATION et al.,
  *Defendants-Appellees.*

No. 05-6477

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00312—William J. Haynes, Jr., District Judge.

Argued: July 26, 2006

Decided and Filed: October 17, 2006

Before: MOORE, CLAY, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gerald E. Martin, BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, for Appellants. J. Richard Lodge, Jr., BASS, BERRY & SIMS, Nashville, Tennessee, Harriet A. Cooper, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Gerald E. Martin, George E. Barrett, Edmund L. Carey, Jr., Timothy L. Miles, BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, for Appellants. J. Richard Lodge, Jr., Russell S. Baldwin, BASS, BERRY & SIMS, Nashville, Tennessee, Harriet A. Cooper, Frank H. Lancaster, Maria V. Gillen, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellees.

---

## OPINION

KAREN NELSON MOORE, Circuit Judge. Plaintiffs-Appellants appeal from the district court's dismissal of claims brought against electric cooperatives and the Tennessee Valley Authority (together, "defendants"). Members of the electric cooperatives ("plaintiffs") brought an action against the defendants, claiming that the cooperatives ("Cooperatives") refused to distribute refunds or to reduce electricity rates as required when electric cooperatives have excess revenue. The Cooperatives were prohibited from distributing the refunds on the basis of their contracts with the Tennessee Valley Authority ("TVA"), which supplies the Cooperatives with electricity. The plaintiffs also asserted that the Cooperatives failed to keep adequate records. The district court

1

dismissed the plaintiffs' state-law claims without prejudice because these claims should have been filed as a derivative suit, and it dismissed the plaintiffs' federal-law claims with prejudice. For the reasons discussed below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

The Tennessee General Assembly has stated "that rural electric cooperatives . . . have proved to be ideal business organizations in providing adequate and reliable electric services at reasonable rates throughout the rural communities of Tennessee." TENN. CODE ANN. § 65-25-201(b)(1). The defendants include 22 electric cooperatives that supply electricity to over 700,000 cooperative members in Tennessee. The Cooperatives are nonprofit corporations organized pursuant to Tennessee's Rural Electric and Community Services Cooperative Act ("RECSCA"). TENN. CODE ANN. § 65-25-203.[1] The Cooperatives purchase electricity from the Tennessee Valley Authority, which is "the nation's largest public power producer."[2] Joint Appendix ("J.A.") at 83 (TVA 2002 Annual Report at 2).

If electric cooperatives accrue excess revenue beyond what is necessary to cover specified expenses, these funds must be distributed in one of the following three ways: "(A) As patronage refunds prorated in accordance with the patronage of the cooperative by the respective patrons paid for during or with respect to such fiscal year;[3] (B) By way of general reductions of rates or other charges; or (C) By any combination of methods in (b)(1)-(3)." TENN. CODE ANN. § 65-25-212(a). Section 65-25-212(b) provides as follows:

> (b) With respect to the supplying or furnishing of services in pursuance of one (1) or more secondary purposes, the revenues of a cooperative shall, as separately accounted for and determined for each such service, be first applied as provided in subdivisions (a)(1)-(6) and then distributed to the patrons of each such service in the manner provided for in the bylaws, either:
> (1) As patronage refunds prorated in accordance with the patronage of the cooperative by the respective patrons paid for during or with respect to such fiscal year;
> (2) By way of general reductions of rates or other charges;
> (3) By crediting patrons with having furnished the cooperative capital in amounts equal to the amounts of their patronage not refunded pursuant to subdivision (b)(1) and not used for general reduction of rates or other changes pursuant to subdivision (b)(2), all or any portion of such capital to be redeemable and be retired at such later time as the board in its sole discretion determines that such will not impair the cooperative's financial condition and will be in the cooperative's best interests; or
> (4) By any combination of methods in subdivisions (b)(1)-(3).

---

[1] Section 65-25-203 states:
Electric cooperatives heretofore incorporated under the former "Electric Cooperative Law" or hereafter incorporated under this part shall be organized and operated on a nonprofit basis and without pecuniary gain, and shall furnish their services on an area coverage basis at the lowest cost consistent with sound business principles.

[2] "Wholly owned by the U.S. government, TVA was established by Congress in 1933 primarily to provide navigation, flood control and agricultural and industrial development and to promote the use of electric power in the Tennessee Valley region." Joint Appendix ("J.A.") at 83 (TVA 2002 Annual Report at 2).

[3] The plaintiffs explain that "patronage capital is the amount of a Cooperative member's payment for electricity above and beyond the cost of providing that electricity." Appellants Br. at 5.

However, "[n]othing contained in subsection (a) or (b) shall be construed to prohibit the payment by a cooperative of all or any part of its indebtedness prior to the date when the same shall become due." § 65-25-212(c). The Cooperatives' contracts with the TVA prohibited the distribution of patronage refunds.[4] The plaintiffs claim that the Cooperatives wrongfully withheld patronage capital and failed to maintain properly records of each member's patronage capital.[5]

On April 12, 2004, the plaintiffs filed a complaint against the Cooperatives and the TVA in federal district court. The plaintiffs' complaint included the following claims: violation of the Sherman Act, 15 U.S.C. § 1; violation of the Tennessee Trade Practices Act, TENN. CODE ANN. § 47-25-101; violation of the Tennessee Consumer Protection Act, TENN. CODE ANN. §§ 47-18-104(b)(27) and 47-18-109; breach of fiduciary duty; and failure to refund patronage capital or to reduce rates as required by Tennessee Code Annotated § 65-25-212(a). The TVA and the Cooperatives each filed motions to dismiss the plaintiffs' claims against them. The plaintiffs filed an amended complaint in July 2004 that included a Fifth Amendment takings claim and a Fifth and Fourteenth Amendment due process claim.

The district court issued an order on August 4, 2004, staying discovery and seeking a response from the plaintiffs as to the following issues raised in the Cooperatives' motion to dismiss: "(1) Whether Plaintiffs' claims are derivative claims; (2) if Plaintiffs' claims are deemed derivative claims, whether the Plaintiffs complied with State law to assert these claims; and (3) whether the Plaintiffs have standing to sue cooperatives of which Plaintiffs are not members." J.A. at 322 (Dist. Ct. Order). The plaintiffs filed a response to this order on August 19, 2004, and they also filed a motion for leave to file a second amended complaint expanding the plaintiff class to include members of additional cooperatives. The district court never ruled on the plaintiffs' motion for leave to file a second amended complaint.

On December 3, 2004, the district court granted the defendants' motions to dismiss;[6] it dismissed the plaintiffs' state-law claims without prejudice, and it dismissed the plaintiffs' federal-law claims with prejudice. The plaintiffs filed a motion to alter or amend the district court's judgment, claiming that there was no basis for dismissing their constitutional claims or for finding that their state-law claims were derivative in nature. The district court denied the plaintiffs' motion on July 29, 2005; in addressing the plaintiffs' constitutional claims, the district court concluded that there was no state action and that the plaintiffs had an adequate remedy under state law. The plaintiffs timely appealed from the district court's December 2, 2004 and July 29, 2005 orders.

## II. ANALYSIS

### A. Standard of Review

We review de novo the district court's grant of the defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Downie v. City of Middleburg Heights*, 301 F.3d 688, 693 (6th Cir. 2002). We "treat[] all well-pleaded allegations in the complaint as true, and . . . find[]

---

[4] The defendants did not provide the plaintiffs with copies of the contracts between the Cooperatives and the TVA. However, the Cooperatives agree that these contracts prohibit patronage refunds.

[5] The Cooperatives are required to maintain records of their members' patronage capital. TENN. CODE ANN. § 65-25-204(d)(1).

[6] The TVA requested that the district court dismiss the plaintiffs' claims on the basis of a lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), but the district court did not address the jurisdictional argument in its ruling.

dismissal proper only if it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of the claims that would entitle [them] to relief." *Id.* (internal quotation marks omitted).

**B. Judicial Review**

The TVA characterizes the case as "a judicial challenge to the level of rates set by the TVA Board of Directors for the sale of TVA power at retail and to the terms and conditions for the sale of that power." TVA Br. at 22. As a result of this, the TVA argues that we should affirm the district court's dismissal of the plaintiffs' claims because these claims are not subject to judicial review. The plaintiffs expressly state in their reply brief that "this lawsuit is not about rate making." Appellants Reply Br. at 23. Instead, they argue that they are seeking an accounting of the patronage accounts. *Id.* However, because the plaintiffs also argue that they were improperly denied patronage capital, Appellants Br. at 14, we believe it is necessary to address the question of judicial review.

"A long line of precedent exists establishing that TVA rates are not judicially reviewable." *Matthews v. Town of Greeneville*, No. 90-5772, 1991 WL 71414, at *2 (6th Cir. May 2, 1991) (unpublished opinion), *cert. denied*, 502 U.S. 938 (1991); *see also 4-County Elec. Power Ass'n v. TVA*, 930 F. Supp. 1132, 1137 (S.D. Miss. 1996) ("Plaintiff acknowledges that by virtue of TVA's having been granted by Congress full discretionary authority with respect to setting rates, TVA's rate-making decisions are beyond the scope of judicial review under the APA."); *Carborundum Co. v. TVA*, 521 F. Supp. 590, 593 (E.D. Tenn. 1981) (noting the "well established legal princip[le] that the setting of power rates under the Tennessee Valley Authority Act is not subject to judicial review"); *Mobil Oil Corp. v. TVA*, 387 F. Supp. 498, 506-07 (N.D. Ala. 1974) ("[T]he judgment or expertise of the Authority in setting the electric power rates is a matter committed to its discretion by law and is not subject to judicial review.") (citation and footnote omitted); *Ferguson v. Elec. Power Bd. of Chattanooga, Tenn.*, 378 F. Supp. 787, 789 (E.D. Tenn. 1974) ("[T]he matter of rate setting under the Tennessee Valley Authority Act is not subject to judicial review."), *aff'd*, 511 F.2d 1403 (6th Cir. 1975).

The plaintiffs' claims "against the TVA must be evaluated under the provisions of the Administrative Procedure Act (APA)." *Matthews*, 1991 WL 71414, at *2. Parties may seek judicial review of agency action[7] unless the relevant statute precludes such review, 5 U.S.C. § 701(a)(1), or the "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). "If it is determined that either situation exists, then a court must decline to exercise jurisdiction over the matter."[8] *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1124 (6th Cir. 1996).[9] The TVA Act

---

[7] The Supreme Court has explained that "28 U.S.C. § 1331, generally granting federal question jurisdiction, 'confer[s] jurisdiction on federal courts to review agency action.'" *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (alteration in original) (quoting *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). Furthermore, "'the Administrative Procedure Act, . . . embodies the basic presumption of judicial review to one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute."'" *Id.* at 56-57 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

[8] The Supreme Court analyzed § 701(a)(1) and (a)(2) in *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), explaining that:
> The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

[9] We note that the Supreme Court has recently "instruct[ed] [the] courts of appeals to properly distinguish between subject-matter jurisdiction and other limits on a court's authority." *Cobb v. Contract Transport Inc.*, 452 F.3d 543, 550 (6th Cir. 2006); *see also Arbaugh v. Y & H Corp.*, 126 S. Ct. 1235, 1242 (2006); *Eberhart v. United States*,

authorizes the TVA to enter into contracts to sell its surplus power, and the Act provides that: "the Board is authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purpose of this chapter." 16 U.S.C. § 831i. Courts have acknowledged that "the TVA Act accords the TVA a great amount of discretion in its contractual relations with municipalities." *Matthews*, 1991 WL 71414, at *3. The TVA acted within the scope of its authority under the TVA Act in entering into contracts with the Cooperatives. The contractual provisions that prevent the Cooperatives from distributing patronage refunds were created within the TVA's authority to set "resale rate schedules" pursuant to § 831i, because "determinations about the level of rates necessary to recover the various costs of operating TVA's power system, as well as the terms and conditions of TVA's power contracts, . . . are part of TVA's unreviewable rate-making responsibilities." *4-County*, 930 F. Supp. at 1138; *see also Carborundum Co.*, 521 F. Supp. at 594 (holding that a contractual "minimum bill provision" was "simply an integral portion of the rates which TVA has fixed, pursuant to express congressional authority"). To the extent that Tennessee law imposes additional constraints on the TVA's authority, it is preempted by the TVA Act's express grant of discretion and the APA's prohibition on judicial review. *See Millsaps v. Thompson*, 259 F.3d 535, 538 (6th Cir. 2001) ("[F]ederal law preempts state law when the two actually conflict."). We thus decline to review any of the plaintiffs' challenges to the contractual term prohibiting the distribution of patronage refunds.

Our decision not to review the TVA's contract also extends to the Cooperatives' enforcement of that contract. *See Allen v. Elec. Power Bd.*, 422 F. Supp. 4, 6 (M.D. Tenn. 1976) ("By parity of reasoning, the imposition of the rate adjustment schedules by TVA's distributors pursuant to their contracts with TVA are likewise not reviewable."). Federal law preempts Tennessee law on this point as well. *See Millsaps*, 259 F.3d at 538 (stating that federal law preempts state law "when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941))). If we were to review the Cooperatives' actions in enforcing the contract, we would still be reviewing the TVA's actions and thus ignoring the APA's prohibition on judicial review.

This does not end our inquiry. The plaintiffs' claims under the Tennessee Consumer Protection Act, Tennessee Code Annotated § 65-25-212, and for breach of fiduciary duty are based in part on the Cooperatives' failure to issue patronage refunds; the Cooperatives failed to issue the refunds as a result of their contracts with the TVA, which are not subject to review. However, we will still proceed to review these claims to the extent that they are also based upon the Cooperatives' failure to reduce rates and to maintain records properly. We will also proceed to review plaintiffs' constitutional claims, which are not limited by the TVA Act or the APA. Finally, we will review those aspects of plaintiffs' antitrust claim that are not based on the terms of the contracts between the TVA and the Cooperatives.

## C. Derivative Nature of Plaintiffs' State-Law Claims

"A derivative action is an extraordinary, equitable remedy available to shareholders when a corporate cause of action is, for some reason, not pursued by the corporation itself." *Lewis v. Boyd*, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992). Tennessee "requires the shareholder to first make a written demand on the corporation's directors requesting them to prosecute the suit or to take other

---

126 S. Ct. 403, 405 (2005); *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). In *Madison-Hughes*, we stated that "courts do not have subject matter jurisdiction to review agency actions that are 'committed to agency discretion by law.'" *Madison-Hughes*, 80 F.3d at 1127 (quoting 5 U.S.C. § 701(a)(2)). It is not at all clear today that this is actually a matter of subject-matter jurisdiction in light of *Arbaugh*, *Eberhart*, and *Kontrick*; however, because we decline to review any claims based on the TVA's rate-making decisions, we do not need to make that determination at this time.

suitable corrective action. This precondition is commonly known as the demand requirement." *Id.* (internal quotation marks omitted). The demand requirement serves several purposes: "to allow the directors to occupy their normal status as the conductors of the corporation's affairs, to encourage informal resolution of intracorporate disputes, and to guard against misuse of the derivative remedy." *Id.*

The district court held that the plaintiffs' state-law claims[10] were derivative rather than direct[11] and that the plaintiffs' failure to make a pre-suit demand to the Cooperatives could not be excused on the basis of futility.[12] The plaintiffs challenge both the precedent upon which the district court relied as well as the district court's application of that precedent to the facts of this case.[13]

### 1. Tennessee standards for determining whether a suit is derivative or direct

The district court cited the following rule from *Cato v. Mid-America Distribution Centers, Inc.*, No. 02A01-9406-CH-00149, 1996 WL 502500, at *5 (Tenn. Ct. App. Sept. 6, 1996) (unpublished opinion): "Stockholders may bring an individual action to recover for an injury done directly to them that is separate and distinct from any injury incurred by the corporation or other shareholders." *Cato*, 1996 WL 502500, at *5, cited *Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689 (Tenn. 1988), which in turn stated that "[s]tockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer." The district court also discussed *Davis v. Appalachian Electric Co-Operative, Inc.*, 373 S.W.2d 450 (Tenn. 1963), a 1963 case involving an analogous effort by plaintiffs to obtain patronage refunds from an electric cooperative. In *Davis*, the Tennessee Supreme Court held that the plaintiffs were required to "show that [their] remedies permitted within the corporate structure have been exhausted, or that such an attempt to exhaust said remedies would be a useless gesture." *Davis*, 373 S.W.2d at 452.

---

[10] As noted above, the Cooperatives are organized on a nonprofit basis pursuant to Tennessee Code Annotated § 65-25-203. The district court correctly considered the plaintiffs to be shareholders of the Cooperatives. *See Davis v. Appalachian Elec. Coop., Inc.*, 373 S.W.2d 450, 452 (Tenn. 1963) (discussing members of an electric cooperative as the equivalent of shareholders of a corporation); *accord Alston v. Black River Elec. Coop.*, 548 S.E.2d 858, 860 & 861 n.3 (S.C. 2001) (stating that electric cooperative members are similar to shareholders and listing other state-court decisions that concluded similarly)

[11] Several Tennessee Court of Appeals cases have "recognized the right of members of a nonprofit corporation to bring the equivalent of a shareholder derivative action against the directors and officers for wasting corporate assets and using corporate assets for personal gain." *Summers v. Cherokee Children & Family Servs., Inc.*, 112 S.W.3d 486, 506 (Tenn. Ct. App. 2002); *see also Hannewald v. Fairfield Cmtys., Inc.*, 651 S.W.2d 222, 225-26 (Tenn. Ct. App. 1983); *Bourne v. Williams*, 633 S.W.2d 469, 471-73 (Tenn. Ct. App. 1981).

[12] The district court properly applied Tennessee law. *See also Hicks ex rel. Union Pac. Corp. v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003) ("Tennessee has long adhered to the internal affairs doctrine, under which matters involving the internal affairs of a foreign corporation are deemed substantive in nature and should be resolved in accordance with the law of the state of incorporation.") (internal quotation marks omitted).

[13] In its brief, the TVA addressed the question of whether the "district court improperly dismissed [the plaintiffs'] claims because no motion to dismiss the constitutional claims had been filed." TVA Br. at 20. However, the plaintiffs noted this fact in their recitation of the procedural history but did not actually raise it as an issue for our review

The plaintiffs argue that the Tennessee courts no longer apply the test set forth in *Cato* for determining whether an action is direct or derivative; rather, they argue, Tennessee precedent reflects recent changes in Delaware's approach to this issue.[14] The Delaware Supreme Court explained:

> The trial court's premise was as follows:
>> In order to bring a *direct* claim, a plaintiff must have experienced some "special injury." A special injury is a wrong that "is separate and distinct from that suffered by other shareholders, . . . or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation.
>
> In our view, the concept of "special injury" that appears in some . . . cases is not helpful to a proper analytical distinction between direct and derivative actions. We now disapprove the use of the concept of "special injury" as a tool in that analysis.

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) (citations and footnote omitted). *Tooley* held that "[t]he analysis must be based solely on the following questions: Who suffered the alleged harm - the corporation or the suing stockholder individually - and who would receive the benefit of the recovery or other remedy?" *Id.* The plaintiffs argue that "[c]ourts in Tennessee follow Delaware law in determining whether an action is derivative or direct," citing *Denver Area Meat Cutters & Employers Pension Plan v. Clayton*, 120 S.W.3d 841, 859-60 (Tenn. Ct. App. 2003). Appellants Br. at 19. However, the defendants respond that *Clayton* involved two Delaware corporations and any citation to Delaware law is indicative only of the rule that Tennessee courts apply the law of the state of incorporation to internal corporate disputes. *Clayton*, 120 S.W.3d at 849.

We agree with the plaintiffs that if presented with this issue, the Tennessee Supreme Court would likely adopt the rule articulated in *Tooley*, rather than adhering to its 1988 decision in *Hadden*. The Tennessee Court of Appeals explained that "Delaware has become the most popular state in which to incorporate businesses, and Delaware's judiciary are recognized as specialists in the field of corporate law. Courts of other states consider the decisions of Delaware courts on corporate matters to be instructive." *Bayberry Assocs. v. Jones*, No. 87-261-II, 1988 WL 137181, at *5 n.8 (Tenn. Ct. App. Nov. 9, 1988) (unpublished opinion). The appellate court decision in *Bayberry* was vacated, but the Tennessee Supreme Court did not dispute the lower court's use of Delaware law. *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 560 (Tenn. 1990). Rather, the supreme court merely provided its own analysis of the applicability of Delaware precedent. *Id.* We believe that the supreme court would agree with the well-reasoned analysis in *Tooley*. However, we note that the resolution of this issue is not dispositive of the claims before us, because we believe that the plaintiffs' state-law claims are properly characterized as derivative under either the *Hadden*, *Cato*, or *Tooley* tests.

---

[14] The plaintiffs also contend that *Davis* "does not represent the current state of the law," because it "was issued at a time before Tennessee courts had even recognized direct actions, much less the distinction between direct and derivative actions." Appellants Br. at 22. It is true that the holding in *Davis* is phrased in terms of exhausting corporate remedies as opposed to making a distinction between direct and derivative suits. *Davis*, 373 S.W.2d at 452; *see also Daugherty v. Tri-County Elec. Membership Corp.*, No. 01A01-9607-CV-00334, 1997 WL 13757, at *3 (Tenn. Ct. App. Jan. 16, 1997) (unpublished opinion) ("*Davis* held that before seeking judicial relief, the plaintiffs must have first exhausted their remedies within the corporation."). However, *Davis* supports the defendants' position to the extent that both the requirement of exhaustion of the corporate remedies and the demand requirement are structured to encourage internal resolution of corporate disputes. *See Davis*, 373 S.W.2d at 454 (discussing the policy rationale for the exhaustion rule); *Lewis*, 838 S.W.2d at 221 (discussing the policies for the demand requirement).

### 2. Application of the rules

In their brief, the plaintiffs argue that the Cooperatives have failed to account for each member's patronage capital and "have improperly spent their surplus revenue on items unrelated to their statutory purpose such as beauty pageants, all expense trips for board members around the country, and unnecessary capital improvements." Appellants Br. at 8-9. We believe that the plaintiffs' claims are essentially claims of "mismanagement, self-dealing, and breach of fiduciary duty." *Cato*, 1996 WL 502500, at *6. If the Cooperatives failed to maintain records and spent their money on non-necessary expenses, it is clear that they were not acting in accordance with their statutory purpose of providing their members with electricity "at the lowest cost consistent with sound business principles." TENN. CODE ANN. § 65-25-203; *see also Bourne v. Williams*, 633 S.W.2d 469, 470-73 (Tenn. Ct. App. 1981) (discussing a derivative claim brought by shareholders of a nonprofit corporation alleging that the corporation "[took] actions contrary to the best interests of the Corporation, and in violation of the purposes for which the Corporation was formed"). Such claims "must generally be brought as derivative actions because breaches of fiduciary duty are deemed to injure only the corporation."[15] *Cato*, 1996 WL 502500, at *6. We agree with the district court's conclusion that the plaintiffs' state-law claims are derivative rather than direct.

### 3. Demand requirement

Finally, the plaintiffs contend that even if their state-law claims are derivative, a pre-suit demand would have been futile. Tennessee law recognizes "demand excused cases" on the basis of futility if the shareholders demonstrate "(1) that the board is interested and not independent and (2) that the challenged transaction is not protected by the business judgment rule." *Lewis*, 838 S.W.2d at 222. The plaintiffs contend that demand would have been futile in this case due to the contractual prohibition against distributing patronage refunds as well as the asserted fact that "the Cooperatives have not kept adequate records for the determination of each member's patronage capital."[16] Appellants Br. at 23.

The district court correctly concluded that "the Plaintiffs have failed to plead adequately that a pre-suit demand should be excused." J.A. at 424 (Dist. Ct. Mem. at 14). As an initial matter, the fact that the contract between the TVA and the Cooperatives prohibits patronage refunds is not dispositive, because the "Plaintiffs sought distribution of excessive revenue in the form of either patronage refunds or rate reduction under Tenn. Code Ann. § 65-25-212." *Id.* There is no assertion that the contract prevents the Cooperatives from reducing rates in accordance with § 65-25-212. With regard to the Cooperatives' alleged failure to maintain adequate records, we will not assume that if presented with a pre-suit demand, the defendants would not have found some method for complying with the statutory provisions. More importantly, this factor is irrelevant to the recognized bases upon which Tennessee courts will excuse a failure to file a pre-suit demand, *Lewis*, 838

---

[15] The plaintiffs also assert that their claims cannot be classified as derivative because their "definition of the class includes individuals who are former members of the Cooperatives" who would not have any remedy as a result of a derivative action. Appellants Br. at 21. However, this will have no effect on the case because the plaintiffs have explained that they primarily are seeking an accounting by the Cooperatives. They have characterized their claim in this manner because the Cooperatives do not necessarily need to provide patronage refunds and can instead use excess funds (if any) to reduce rates or to pay off debt. TENN. CODE ANN. § 65-25-212. The result of the derivative suit would thus provide the desired remedy for all of the individuals in question.

[16] This assertion is based upon an article entitled "Co-ops: Members rarely involved; co-ops don't tell them exactly how much they own"; the article was published in The Tennessean on April 11, 2004. J.A at 344. The article explains that many electric cooperatives in Tennessee do not maintain records of their owners' interests. For example, the Middle Tennessee Electric Membership Corporation is asserted to have stated that it has no records prior to the 1980s for its members.

S.W.2d at 222: the failure to keep adequate records does not indicate that the board is interested or that the business-judgment rule does not apply.

### D. Federal Constitutional Claims

#### 1. State action

The plaintiffs filed their constitutional claims pursuant to 42 U.S.C. § 1983,[17] which "has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights." *Harajli v. Huron Twp.*, 365 F.3d 501, 505 (6th Cir. 2004) (internal quotation marks omitted). "A private actor acts under color of state law when its conduct is 'fairly attributable to the state.'" *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947 (1982)). The Cooperatives state that the district court properly dismissed the plaintiffs' constitutional claims because the plaintiffs were unable to prove that the Cooperatives acted under color of state law.[18]

The plaintiffs first respond that the Cooperatives operate according to state legislative mandate and in conjunction with the state government. It is true that the Cooperatives are subject to a number of state regulations and are instructed to act to fulfill state objectives; however, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974). The plaintiffs also argue that the Cooperatives are "thoroughly 'entwined' with the operation of the TVA" by virtue of the contracts between these two entities. Appellants Reply Br. at 16. However, the existence of a contract alone does not rise to the level of "pervasive entwinement" recognized in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 298-302 (2001).[19] *See also Carter v. Buckeye Rural Elec. Coop.*, No. C2-00-1204, 2001 WL 1681104, at *5 (S.D. Ohio Sept. 7, 2001) (unpublished opinion) (holding that an electric cooperative was not a state actor). Because the plaintiffs offer no support for their contention that the Cooperatives are state actors beyond the fact of the contractual relationship with the TVA and the existence of extensive state regulation, we affirm the district court as to this issue.

---

[17] Section 1983 states:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[18] We need only analyze this issue with regard to the Cooperatives, because there is no question that "TVA is an agency and instrumentality of the United States." TVA Br. at 36 n.16. In its brief, the TVA explains that it is not subject to suit pursuant to the Fourteenth Amendment or to § 1983: "[t]his is because of the basic precept that '[t]he Fourteenth Amendment's Due Process Clause restricts the activities of the states and their instrumentalities; whereas the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government.'" TVA Br. at 36 n.16 (second alteration in original) (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n.8 (6th Cir. 2000)). The TVA concedes, however, that it is "subject to the Fifth Amendment to the Constitution." TVA Br. at 36 n.16. Thus, we still must address the merits of the plaintiffs' constitutional claims. *See infra* Section II.D.2.

[19] The *Brentwood Academy* Court found that there was sufficient entwinement based on the fact that the association was comprised primarily of public-school representatives and that members of the association were a part of the state retirement system. *Brentwood Academy*, 531 U.S. at 298-302.

### 2. Property interest

The plaintiffs' constitutional claims also fail on the merits, against both the TVA and the Cooperatives. Both their due process and takings claims require that the plaintiffs first demonstrate that they have a legally cognizable property interest. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Hamby v. Neel*, 368 F.3d 549, 557 (6th Cir. 2004) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). We have explained that such interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* (quoting *Roth*, 408 U.S. at 576).

The plaintiffs argue that they have property interests in their patronage capital. However, this claim fails because § 65-25-212(a)-(c) explicitly allows the Cooperatives to use excess funds to reduce rates or to pay off debt. *See also Shadow v. Volunteer Elec. Coop.*, 448 S.W.2d 416, 419 (Tenn. 1969) (holding that a cooperative was permitted to enter a contract with the TVA that prevented the cooperative from distributing patronage refunds). The plaintiffs thus have no legitimate claim of entitlement to patronage refunds. The plaintiffs also argue that the Cooperatives' failure to maintain records of the patronage capital has made it impossible for the Cooperatives ever to distribute patronage capital. Because the plaintiffs are not entitled to the patronage capital as an initial matter, the failure of the Cooperatives to maintain records does not deprive them of a property interest.

### E. Antitrust Claim

The plaintiffs "challenge the contractual provision between TVA and the Cooperatives prohibiting patronage refunds as an unreasonable restraint of trade and interstate and intrastate commerce in violation of Section 1 of the Sherman Antitrust Act,[20] 15 U.S.C. § 1."[21] Appellants Br. at 37. Section 1 states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." The defendants respond that it "makes no sense" that the TVA and the Cooperatives violated the Sherman Act by virtue of "contracts fully authorized by the United States Congress and the Tennessee General Assembly." TVA Br. at 34. The district court held that the TVA and the Cooperatives cannot be liable under the Sherman Act for entering into contracts pursuant to "express congressional authority."[22] J.A. at 425 (Dist. Ct. Mem. at 15).

---

[20] The plaintiffs' state-law antitrust claims filed pursuant to Tennessee Code Annotated § 47-25-106 fail in light of § 47-18-111(a)(1), which provides that "[t]he provisions of this part shall not apply to . . . [a]cts or transactions required or specifically authorized under the laws administered by . . . officers acting under the authority of this state or of the United States." The TVA clearly was acting within its authority pursuant to the TVA Act when it entered into the contracts with the Cooperatives. *See* 16 U.S.C. § 831i.

[21] As discussed above, we may not review the terms of the contract between the TVA and the Cooperatives because such terms are wholly within the TVA's discretion to set rates. However, the plaintiffs' complaint alleges that the Cooperatives and the TVA engaged in a conspiracy to withhold the refunds as well as to fail to reduce rates. In their brief, the plaintiffs also discuss the effect of patronage capital rates. We do not believe that the plaintiffs' antitrust allegations are limited to the terms of the contract (and thus to rate-setting by the TVA), and we accordingly review the plaintiffs' antitrust arguments.

[22] The district court also cited *Kreager v. General Electric Co.*, 497 F.2d 468, 472 (2d Cir.), *cert. denied*, 419 U.S. 861 (1974), for the proposition that "generally members of a business unit cannot sue the entity for a federal antitrust violation." J.A. at 425 (Dist. Ct. Mem. at 15). The Second Circuit stated, "Kreager lacked standing to bring a private anti-trust action to recover damages for injuries allegedly sustained by his corporation." *Kreager*, 497 F.2d

In analyzing the plaintiffs' Sherman Act claim, we first consider whether the TVA is entitled to immunity on the basis of its status as a federal corporation. "The Sherman Act imposes liability on any 'person.'" *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004). "The word 'person' . . . shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 15 U.S.C. § 7. However, "person" does not include the federal government. *Flamingo*, 540 U.S. at 745. In *Flamingo Industries*, the Supreme Court analyzed "whether for purposes of the antitrust laws the Postal Service is a person separate from the United States itself." *Id.* at 746. Although some prior cases have recognized that the TVA is immune from antitrust liability,[23] the *Flamingo Industries* analysis casts doubt on such a conclusion. The Court noted that the Postal Service "remains part of the Government," *id.* at 746, and that it has "different goals, obligations, and powers from private corporations," *id.* at 747. However, "had the Congress chosen to create the Postal Service as a federal corporation, we would have to ask whether the Sherman Act's definition extends to the federal entity under this part of the definitional text." *Id.* at 746. The TVA also has certain public characteristics,[24] but it *is* organized as a corporation. 16 U.S.C. § 831. While this is not an easy question, we believe that the key distinction presented by *Flamingo*, that the TVA is a federal corporation unlike the Postal Service, supports the conclusion that the TVA is not immune from antitrust liability on these grounds.

Both the TVA and the Cooperatives acted pursuant to federal and state law, which is also relevant to our antitrust analysis. The district court relied on *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 689 (1975), which held that exchange commission rates approved by the Securities and Exchange Commission ("SEC") pursuant to the Securities Exchange Act of 1934 are entitled to antitrust immunity. The *Gordon* Court explained that "[r]epeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a plain repugnancy between the antitrust and regulatory provisions will repeal be implied." *Gordon*, 422 U.S. at 682. *Gordon* was concerned that the exchanges would be exposed to "conflicting standards," because "the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry." *Id.* at 689. The Court concluded that "[t]o permit operation of the antitrust laws with respect to commission rates . . . would unduly interfere, in our view, with the operation of the Securities Exchange Act." *Id.* at 685-86. The TVA is authorized to enter into contracts for the purpose of "promot[ing] the wider and better use of electric power for agricultural and domestic use, or for small or local industries." 16 U.S.C. § 831i. *Gordon*'s rationale is applicable to § 831i, because the TVA's primary concern is to provide services, and concerns about competition would conflict with the fulfillment of TVA's purpose. Thus, the TVA is entitled to antitrust immunity on the basis of the

---

at 472. However, the plaintiffs in this case allege that the Cooperatives themselves violated antitrust law, not that the Cooperatives were injured by the actions of other corporations. *See id.* at 470 (explaining that Kreager's company was purportedly injured by a conspiracy between the defendant companies).

[23] *See City of Loudon v. TVA*, 585 F. Supp. 83, 87 (E.D. Tenn.) ("In enforcing . . . its contract with Loudon, TVA was engaged in valid governmental action and exempt from the antitrust laws of the United States."), *aff'd*, 754 F.2d 372 (6th Cir. 1984); *Webster County Coal Corp. v. TVA*, 476 F. Supp. 529, 532 (W.D. Ky. 1979) (holding that the TVA is "exempt from liability under the antitrust laws"); *see also Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 246 n.5 (D.C. Cir. 1981) (citing *Webster County*), *cert. denied*, 455 U.S. 919 (1982).

[24] For instance, the TVA has the power of eminent domain. 16 U.S.C. § 831c(h). *See Flamingo*, 540 U.S. at 747 ("Finally, the Postal Service has many powers more characteristic of Government than of private enterprise, including its state-conferred monopoly on mail delivery, the power of eminent domain, and the power to conclude international postal agreements.")

rationale explicated in *Gordon*. We affirm the district court's dismissal of the plaintiffs' antitrust claims.[25]

### F. Alternative Grounds for Dismissal

The defendants also argue that this court should affirm the district court's grant of their motions to dismiss because the plaintiffs failed to state a claim for a violation of the RECSCA, the Tennessee Trade Practices Act, the Tennessee Consumer Protection Act, or for breach of a fiduciary duty. For each of these state-law claims, the plaintiffs argue that the Cooperatives improperly refused to issue patronage refunds or reduce rates and failed to maintain its patronage records. The underlying premise of the plaintiffs' arguments is that the Cooperatives mismanaged their excess revenue, and mismanagement of funds is typically a derivative claim. *Cato*, 1996 WL 502500, at *6. We need not address the merits of these arguments, because the district court correctly dismissed these claims without prejudice so that the plaintiffs could raise them in a state-law derivative suit.

## III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the judgment of the district court.

---

[25] In addition, the Cooperatives are empowered to enter into contracts with the TVA pursuant to Tennessee's Rural Electric and Community Services Cooperative Act. TENN. CODE ANN. § 65-25-205. The Supreme Court has recognized a state-action exemption from antitrust immunity, reasoning that "when a 'state in adopting and enforcing [a regulatory] program . . ., as sovereign, imposed the restraint as an act of government,' the program could not violate the Sherman Act because the Act was directed against 'individual and not state action.'" *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 440 (6th Cir. 2006) (alteration in original) (quoting *Parker v. Brown*, 317 U.S. 341, 352 (1943)). Because the Cooperatives conduct their activity "pursuant to state authorization," the following test applies: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Id.* at 441 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 105 (1980)).

With regard to the first prong of the *Midcal* test, we do not require "explicit authorization," *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 535 (6th Cir. 2002) (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42-44 (1985)); rather, "[t]he *Parker* exemption applies as long as the suppression of competition is the foreseeable or logical result of what the state authorizes," *id.* Tennessee clearly authorizes the Cooperatives to enter into contracts with the TVA. TENN. CODE ANN. § 65-25-205. In fact, "the general assembly . . . express[ed] its intent that public electric systems replace competition with the monopoly public service." TENN. CODE ANN § 65-34-108. Tennessee clearly intended to favor cooperatives, and "anticompetitive effects are the logical and foreseeable result" of the statutory scheme. *Mich. Paytel*, 287 F.3d at 536.

There is no indication, though, that Tennessee supervises the electric cooperatives' actions in entering into contracts with the TVA. However, "the active state supervision requirement is not applicable in cases where the actor is a municipality," and there is some argument that "the same should go for cases in which the actor is a 'state agency.'" *Brentwood*, 442 F.3d at 443 n.25; *see also Town of Hallie*, 471 U.S. at 46 n.10 ("In cases in which the actor is a state agency, it is likely that active state supervision would also not be required, although we do not here decide that issue."). *Brentwood* rejected this argument, stating, "circuit precedent suggests that it is only municipalities that are exempt from the second prong of the test." *Brentwood*, 442 F.3d at 443 n.25. However, the "circuit precedent" to which *Brentwood* refers is *Michigan Paytel*, which merely held that private parties are required to satisfy both prongs of the *Midcal* test. *Mich. Paytel*, 287 F.3d at 536.

The Seventh Circuit held that electric cooperatives should be exempt from antitrust liability due to their semi-public status and the fact that their "only purpose is to provide power to [their] members as cheaply as possible." *Fuchs v. Rural Elec. Convenience Coop., Inc.*, 858 F.2d 1210, 1217-18 (7th Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989). *Fuchs* held "that when an entity charged with an antitrust violation is neither a municipality nor a state agency but does not have the attributes of a purely private actor, it may be held immune as a state actor without the active scrutiny of market conditions which is a necessary prerequisite for holding a private entity immune." *Id.* We agree with the Seventh Circuit that the Cooperatives are neither state agencies nor purely private parties, which may require a grant of antitrust immunity in spite of a lack of supervision. However, we do not need to decide today whether the Cooperatives are entitled to immunity without any demonstration of state supervision, because of our conclusion that the TVA is entitled to antitrust immunity.